**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2026 IL App (3d) 260142-U

Order filed July 23, 2026

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2026

| | | |
|---|---|---|
| *In re* K.C., | ) | Appeal from the Circuit Court |
| | ) | of the 12th Judicial Circuit, |
| a Minor | ) | Will County, Illinois, |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | Appeal No. 3-26-0142 |
| v. | ) | Circuit No. 21-JA-193 |
| | ) | |
| Rodney W., | ) | Honorable |
| | ) | Carmen Julia Goodman, |
| Respondent-Appellant). | ) | Judge, Presiding. |

_____

JUSTICE DAVENPORT delivered the judgment of the court.
Presiding Justice Hettel and Justice Holdridge concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:   Trial court's finding that father was unfit was not against the manifest weight of the evidence. Affirmed.

¶ 2    Respondent, Rodney W., appeals from an order terminating his parental rights to K.C. He

argues the trial court's finding that he was an unfit parent pursuant to two sections of the Adoption

Act (750 ILCS 50/1(D)(i), (s) (West 2024)) was against the manifest weight of the evidence. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4        K.C. was born in June 2021. One week later, the court made the minor a ward of the court and found probable cause she was neglected. K.C.'s mother[1] told caseworkers that K.C.'s father was Ronnie W. or Rodney B., but she would not give any other information. In November 2021, K.C.'s mother for the first time told the court K.C.'s father's name is Rodney W., and the court ordered a diligent search for him.

¶ 5        In September 2023, respondent was served and appeared in court. In November 2023, respondent filed a petition to establish paternity and custody of K.C., but it was later dismissed for want of prosecution. In April 2024, DNA testing confirmed respondent was K.C.'s biological father.

¶ 6        In January 2025, the State petitioned to terminate respondent's parental rights. At the hearing, the court granted respondent's motion for directed finding, noting it could not say the State has proved by clear and convincing evidence that he is unfit.

¶ 7        Respondent began visiting K.C. in March 2025. In May 2025, respondent was arrested on a weapons charge and has been in custody since. In November 2025, the State again petitioned to terminate respondent's parental rights.

¶ 8                                      A. Hearing

---

[1]K.C.'s mother surrendered her parental rights in October 2024 and is not a party to this appeal.

¶ 9    In March 2026, the court heard the State's second petition to terminate respondent's parental rights. The State proceeded on two grounds: depravity (750 ILCS 50/1(D)(i) (West 2024)) and repeated incarcerations (*id.* § 1(D)(s)).

¶ 10    1. *Stipulation*

¶ 11    The parties stipulated to respondent's criminal history and time in detention and to the admission of certified copies of his convictions. Respondent's criminal history consists of two misdemeanor convictions for driving under the influence (DUI), both in 2024, and the following felony convictions: residential burglary (2012), unlawful restraint (2014), unlawful use of a weapon by a felon (2016), unlawful possession of a controlled substance (2021), aggravated battery (2022), and unlawful possession of a weapon by a felon (2025). He is still in custody on the 2025 conviction and his tentative release date is July 2027.

¶ 12    While in jail from May to September 2025, respondent participated in substance abuse classes, attended "substance-abuse AA" meetings, and completed a parenting course. At Robinson Correctional Center, where he was housed at the time of the hearing, respondent was enrolled in an adult basic education program and employed in the facility's dietary department.

¶ 13    2. *Testimony*

¶ 14    Caseworker Abigail Blair testified that before visitation could begin, respondent was required to meet with a therapist to discuss visitation rules. He could have started visitation as early as September 2024, had he engaged with a therapist. Respondent first met with a therapist in February 2025, and his first visit with K.C. took place in March. He attended 10 of 13 scheduled supervised visits. Visits were suspended while respondent was in custody. After court in April 2025, Blair helped facilitate the exchange of email addresses between respondent and K.C.'s foster parents. Respondent has not utilized the email. After respondent was incarcerated, he regularly

3

asked Blair for visits. Blair explained to respondent every time that it was not in K.C.'s best interests. Specifically, due to K.C.'s age, the distance, and respondent's incarceration, the situation would be very confusing for K.C., and she would not be eligible for therapy services until she was older. Phone visits were also not allowed because it would cause K.C. to question why she could not see respondent.

¶ 15    Respondent testified he was notified for the first time that he might be K.C.'s father in 2023. He asked to see K.C. during every conversation with the caseworker. Respondent denied receiving an email address to correspond with K.C. Before respondent's most recent incarceration, he was working in retail and enrolled in commercial driver's license (CDL) training. At the time of the hearing, respondent was waiting to be transferred to Sheridan, a drug program facility. He received drug abuse treatment at Sheridan in 2014. Respondent has engaged in drug classes and therapy sessions while in custody on his 2025 conviction. Respondent does not believe he is an addict but also believes he needs treatment.

¶ 16    Respondent has two DUI convictions and will not be able to advance in his CDL program when he is released until he has a valid driver's license. When asked about his May 2025 arrest, he did not recall being in a parking lot with a cup of liquor and a gun. He testified, "I know what I pled guilty to, but honestly I don't agree with my case, but I'm in jail for it so." He also disputed the reasoning he was fired from his retail job and gave varying explanations.

¶ 17                                B. Court's Ruling

¶ 18    The court found the State proved by clear and convincing evidence that respondent was unfit, based on both depravity (750 ILCS 50/1(D)(i) (West 2024)) and repeated incarcerations (*id.* § 1(D)(s)). In its ruling, the court stated, "He clearly has a lot of felonies here—more than three felonies during the period of time to satisfy [section 1(D)(i) of the Adoption Act (750 ILCS

4

50/1(D)(i) (West 2024))]. Whether he can be rehabilitated or not is questionable." The court also stated,

> "And giving [respondent] some credit for at least going to Sheridan and things of that nature, could he be rehabilitated so, but in terms of [section 1(D)(s) of the Adoption Act (750 ILCS 50/1(D)(s) (West 2024))], I can't get around that given his history during this period of time, and given the fact that he for a number of reasons that *** he won't be out until 2027 of this go around, but even since, as I indicated before, since he was in court before, you know, he picked up some and is in custody as we speak."

¶ 19    Respondent appeals.

¶ 20                                    II. ANALYSIS

¶ 21    The involuntary termination of parental rights is a two-step process. See 705 ILCS 405/2-29(2) (West 2024). "Parental rights may be involuntarily terminated where (1) the State proves, by clear and convincing evidence, that a parent is unfit under grounds set forth in section 1(D) of the Adoption Act, and (2) the trial court finds that termination is in the child's best interests." *In re K.I.*, 2016 IL App (3d) 160010, ¶ 37. On appeal, respondent only challenges the trial court's finding that he was unfit. He does not challenge the trial court's final order that it was in K.C.'s best interests to terminate his parental rights. Accordingly, we confine our discussion to the finding of unfitness.

¶ 22    "We afford great deference to a trial court's finding of unfitness because the trial court is in the best position to view and evaluate the parties and their testimony, and thus we will not reverse unless the trial court's finding was against the manifest weight of the evidence." *In re Je. A.*, 2019 IL App (1st) 190467, ¶ 46. A decision is against the manifest weight of the evidence

5

where the opposite result is clearly evident from the record. *Id.* "When the lower court finds a parent unfit on multiple grounds, the reviewing court will affirm that decision provided the record supports any one ground for termination." *In re I.P.*, 2025 IL App (1st) 250178, ¶ 25.

¶ 23    In this context, depravity is "an inherent deficiency of moral sense and rectitude." (Internal quotation marks omitted.) *In re P.J.*, 2018 IL App (3d) 170539, ¶ 13. Depravity may be shown by a parent's series of acts or course of conduct that indicates a moral deficiency and an inability to conform to accepted morality. *In re Adoption of K.B.D.*, 2012 IL App (1st) 121558, ¶ 200. Under section 1(D)(i) of the Adoption Act, "[t]here is a rebuttable presumption that a parent is depraved if the parent has been criminally convicted of at least 3 felonies under the laws of this State ***; and at least one of these convictions took place within 5 years of the filing of the petition." 750 ILCS 50/1(D)(i) (West 2024). Once the presumption is established, the parent may rebut it by presenting evidence showing that he is not depraved despite his convictions. *P.J.*, 2018 IL App (3d) 170539, ¶ 13. If the parent presents such evidence, the presumption is removed, and the trial court determines the issue based on the evidence presented. *Id.*

¶ 24    Respondent argues the trial court's ruling that he was an unfit parent was against the manifest weight of the evidence. Although he concedes the State provided sufficient evidence to establish depravity, he argues he has overcome the presumption. He argues the trial court contradicted itself by terminating his parental rights, because it suggested he could be rehabilitated, which necessarily implies the absence of depravity. The State argues there was no contradiction because although respondent did some things to show rehabilitative potential, those acts were either court-ordered or insufficient to overcome the presumption of depravity based on his criminal history. The State asserts respondent's numerous felony convictions show he has consistently committed criminal offenses throughout his entire adult life, spanning a period of nearly 15 years,

6

and his criminal record shows an unwillingness to conform to accepted moral standards as demonstrated by his continued criminal behavior throughout these proceedings. We agree with the State.

¶ 25    "Rehabilitation can only be shown by a parent who, *upon leaving prison*, maintains a lifestyle suitable for parenting children safely." (Emphasis added.) *In re J.V.*, 2018 IL App (1st) 171766, ¶ 183. Thus, respondent's completion of drug abuse and parenting classes in jail, though indicative of rehabilitative potential, is not proof of rehabilitation. See *In re A.M.*, 358 Ill. App. 3d 247, 254 (2005) (completing classes in prison, while commendable, does not show rehabilitation). Rehabilitative potential must be actualized by evidence of sustained progress outside of prison. See *J.V.*, 2018 IL App (1st) 171766, ¶ 183; *In re Shanna W.*, 343 Ill. App. 3d 1155, 1167 (2003). The record reflects no such evidence. On the contrary, respondent's criminal history shows a repeated pattern of incarceration, demonstrating he is unable to maintain a lifestyle outside of prison suitable for parenting K.C. Although there was a period of time when he was out of prison, working, and enrolled in a CDL program, he was ultimately arrested and convicted again. He is therefore unable to maintain a lifestyle suitable to parent K.C. safely.

¶ 26    Respondent also showed a lack of remorse for his criminal actions. During his fitness hearing, respondent testified he disagreed with his most recent weapons charge—to which he had pleaded guilty—and did not recall having liquor and a gun in hand at the time of his arrest. Respondent's failure to accept responsibility does little to weaken, let alone rebut the presumption of depravity. See *In re A.H.*, 359 Ill. App. 3d 173, 181 (2005) (noting respondent "demonstrated a lack of remorse for his criminal actions, informing his son that he 'got sentenced for the wrong thing.' "). The court in *A.H.* found the respondent did not rebut the presumption of depravity because he did not show he changed from a violent offender to an individual with "moral sense

7

and rectitude" capable of parenting a child. *Id.* Similarly, here, respondent's lack of remorse undercuts any claim that he had become an individual with moral sense and rectitude capable of parenting a child.

¶ 27   In short, respondent has not rebutted the presumption of depravity. See *P.J.*, 2018 IL App (3d) 170539, ¶ 15 ("An unrebutted presumption of depravity virtually ensures the termination of a respondent's parental rights."). Accordingly, we find the trial court's unfitness finding was not against the manifest weight of the evidence. Moreover, because the evidence supported the finding of depravity, we need not consider the independent ground of repeated incarceration. *A.H.*, 359 Ill. App. 3d at 181.

¶ 28                                III. CONCLUSION

¶ 29   The judgment of the circuit court of Will County is affirmed.

¶ 30   Affirmed.